[L. A. No. 5276.   Department Two.—January 12, 1920.]

UNION OIL COMPANY OF CALIFORNIA (a Corporation), Appellant, v. PACIFIC SURETY COMPANY (a Corporation), et al., Respondents.

[1] Contract—Written Instrument—Modification.—A contract in writing cannot be modified by oral negotiations leading up to its execution or by a subsequent or contemporaneous oral agreement in contradiction of its terms.

---

1. Supplementing written contract by proof of collateral oral agreement, note, Ann Cas. 1914A, 454.

[2] BUILDING CONTRACT—TIME OF PAYMENT OF INSTALLMENTS—SIDE AGREEMENT BETWEEN OWNER AND CONTRACTOR—FAILURE TO RECORD—VOID BUILDING CONTRACT.—A separate and distinct agreement between an owner and building contractor with reference to the time of payment of the installments of the contract price, would invalidate the building contract, if the agreement were not recorded.

[3] PRINCIPAL AND SURETY—RELEASE OF CONTRACTOR'S SURETY—UNDISCLOSED SIDE AGREEMENT BETWEEN OWNER AND CONTRACTOR.— The making of a side agreement between an owner and contractor with reference to payment of installments of the contract price without disclosing the existence thereof to the contractor's surety, would release the surety on the ground of fraud.

[4] ID.—AGREEMENT BETWEEN CONTRACTOR AND CORPORATION—ADVANCEMENT OF MONEYS DURING WORK—ASSIGNMENT OF PAYMENTS—SURETY ON CONTRACTOR'S BOND NOT RELEASED.—Where a pipe-line company, sixty per cent of whose stock was owned by an oil company and who had the same general manager as the oil company, made an agreement with the oil company's building contractor to advance certain moneys to the contractor at specified intervals during the construction of oil reservoirs, in return for the contractor's notes secured by assignment of payments due under the building contract, such agreement did not discharge the surety on the contractor's bond on the ground that it modified the building contract providing for payments to the contractor at different stages of the work under section 1184 of the Code of Civil Procedure, without disclosure to the surety, in the absence of any showing that the agreement was made for the purpose of defrauding the surety.

[5] ID.—CONSTRUCTION OF CONTRACT—RIGHT OF SURETY.—While the surety is entitled to stand upon the strict letter of his contract and insist that the same shall not be altered, this does not mean that he is entitled to invoke equity to read into the written contract provisions not contained therein, for the purpose of defeating his own obligation.

[6] ID.—INDEMNITY AGREEMENT—RIGHT OF OWNER TO SUE.—The owner is entitled to sue upon a contract between the contractor's surety and an indemnitor wherein the latter agreed to pay the surety all damages for which the surety should become responsible upon the bond before it should be compelled to pay the same.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Reversed.

The facts are stated in the opinion of the court.

Andrews, Toland & Andrews, A. V. Andrews, Thomas O. Toland and Paul M. Gregg for Appellant.

Sheldon Borden and Goodrich & Martinson for Respondents.

WILBUR, J.—Plaintiff, hereinafter referred to as the Oil Company, brought this action to recover upon a surety bond in the sum of fifty thousand dollars, executed by the defendant Pacific Surety Company, hereinafter called the Surety Company, and upon an agreement executed by Carl Leonardt, hereinafter called the indemnitor, to indemnify the Surety Company. The bond was to insure the faithful performance by Weber-Duller Company, hereinafter called the contractor, of a contract dated June 28, 1910, for the construction at San Luis Obispo of two reinforced concrete oil reservoirs for appellant, each of a capacity of one million barrels. That contract, hereinafter referred to as "the contract," among other things, guaranteed the plan for the reservoirs as well as the proper construction of the work. One reservoir having partially collapsed, and the other having shown indications of weakness when only two-thirds full, by reason of a defective plan and material, plaintiff was damaged to the extent of $286,534.86, as follows: $161,662.57 by reason of defects in said reservoirs; the loss of eighty thousand barrels of oil valued at forty-eight thousand dollars; $76,872.10 by reason of having to pay mechanics' liens filed on such reservoirs. Judgment was rendered for defendants upon the finding that the time and amount of installment payments fixed in the written contract between the plaintiff and the contractor were not the actual terms of payment, and that the terms and times of such payments were concealed from the respondents at the time of the execution of their respective bonds, and that because of such concealment the respondents were relieved from all liability to appellant. The findings were based upon the conclusion that an agreement, hereinafter called the "side agreement," signed by the Producers Transportation Company, hereinafter called the Transportation Company, by which the latter company agreed to make "loans" to the contractor in installments equal to ten per cent of the contract price at intervals of fifteen days during the progress

of the work, plus five per cent, one hundred and four days after the first payment (which was to be made when the working crew was organized and work well started on each reservoir), aggregating seventy-five per cent of the contract price, was in fact an agreement of the Oil Company, and consequently modified the contract, which provided for different payments at different stages of the work, as required by the provisions of section 1184 of the Code of Civil Procedure, then in force. The contract being thus modified, it was held that the surety was never advised of the true contract, and because of the fraud involved in such concealment was released from its obligation upon such bond. It is not shown or claimed that Surety Company made any inquiries that called for information as to the side agreement from the contractor who secured the bond, or that the Oil Company ever came into contact with the Surety Company. The bond and contract were attached together and filed with the county recorder, as required by section 1183 of the Code of Civil Procedure. [1] The contract of the Oil Company, being in writing, could not be modified by the oral negotiations leading up to the execution of that contract, nor could it be modified by a subsequent or contemporaneous oral agreement in contradiction of its terms. Any subsequent or contemporaneous agreement with relation to the terms and times of payment, in order to affect the written contract between the parties, must have been in writing. Without considering, for the moment, the evidence which convinced the trial court that the written agreement of the Transportation Company was in effect the written agreement of the Oil Company, it should be noted that there was nothing on the face of this agreement which justified the conclusion that the contract of the Oil Company was modified in any way by the contract of the Transportation Company, if we regard these two corporations as separate and distinct entities. The agreement does not purport to be that of the Oil Company, was not executed by the Oil Company, and did not purport to modify the contract of the Oil Company. It purported on its face to be a separate and distinct agreement of a corporation not a party to the Oil Company's contract, for the advancement to the contractor of loans in consideration of six per cent interest, and to be repaid by the contractor, and as a means of such repayment to have

assigned to it the various installments of the contract price as they became due from the Oil Company to the contractor. It is only by going back to the written contract of the parties and taking evidence as to the negotiations between the parties, the relationship between the Oil Company and the Transportation Company, and the method of payment thereafter carried out, that we can arrive at the conclusion that the Transportation Company was in effect the Oil Company so far as the transaction in question was involved. In order to justify this inquiry the defendants alleged the perpetration of a fraud upon them in the securing of the bond and indemnity contract. At the outset of this inquiry it will be observed that no motive can be suggested for the perpetration of such a fraud as would be involved in the making of two separate and distinct contracts by the Oil Company with reference to the time of payment of the installments of the contract price. [2] If such a separate and distinct contract was made, it would invalidate the contract because of the failure to record the side agreement. (Code Civ. Proc., sec. 1183.) The only person to be defrauded by the failure to incorporate the side agreement into the original contract would be the Oil Company, for thereby the contract would be invalidated and the bond released. The Surety Company claims that without showing any injury by reason of the side agreement, it was nevertheless entitled to stand upon the fact that the contract of which it guaranteed performance was not the real contract between the parties, and that the failure to disclose the terms of the side agreement with the Surety Company amounted to a fraud upon it. [3] If it were true that the side agreement did modify the building contract, this position is no doubt well taken, but it cannot be said that a written agreement of the Transportation Company would modify an agreement of the Oil Company in law, and as no actual fraud or misrepresentation is shown there is no basis for inquiring into the relation between the Transportation Company and the Oil Company for the purpose of invoking equitable principles and powers. It cannot be said, then, that, as a matter of law, the implied representation made to the Surety Company that the building contract was the contract between the parties was in fact a misrepresentation made by the contractor to the Surety Company, for it was, in fact, the contract. Even if we

should assume that the stockholders and officers of both
corporations were the same, the fact that in executing the
original contract they acted as the Oil Company, and in
executing the side agreement they acted as the Transporta-
tion Company, would nevertheless result in two separate and
distinct contracts, involving obligations on the part of two
distinct legal entities which would not, and could not, be
merged except by some additional agreement between the
parties. In considering the finding of the trial court that
the side agreement modified and controlled the terms of
payment of the original agreement between the contractor
and the Oil Company, it will be necessary to state some of
the evidence bearing upon the relation between these two
corporations. The Transportation Company was formed for
the purpose of constructing a pipe-line for the transporta-
tion of oil from the San Joaquin Valley to the coast at San
Luis Obispo. It was capitalized at seven million dollars,
sixty per cent of which had been issued to and was owned
by the Oil Company. It had issued bonds which had been
taken by the Union Oil Company, funds had been advanced
by the Oil Company in payment of its stock subscription
and for bonds of the Transportation Company, and with the
money so advanced an oil pipe-line had been constructed
from the San Joaquin Valley to the coast. The Transpor-
tation Company's charge for transporting oil from the val-
ley to the coast was twenty-two and a half cents a barrel.
The board of directors of the two corporations were differ-
ent with the exception of W. L. Stewart, who was also vice-
president and general manager of both corporations. The
business of the Transportation Company, while conducted
through the office and by means of the officers and em-
ployees of the Oil Company, amounted to nearly three hun-
dred thousand dollars a month. A record of these trans-
actions between the two corporations was entered upon
books kept by the employees of the Oil Company. Viewed
as a distinct entity, the Transportation Company had a
special interest in the completion of the reservoirs in ques-
tion, for, in order to transport oil from the valley to the
coast, it was essential that storage facilities be provided at
the coast. The Transportation Company would have re-
ceived four hundred and fifty thousand dollars for trans-
porting to the coast the two million barrels of oil required

to fill the reservoirs agreed to be constructed by the contractor at San Luis Obispo. It should be stated at this juncture that the trial court found that the execution of the side agreement by the Transportation Company was not authorized by the company. It was signed in the name of the company by L. W. Andrews and W. B. Robb. L. W. Andrews was attorney for the Oil Company and conducted the negotiations and drew the building contract, and Andrews and Robb were both directors of the Transportation Company. It was also found "That the said recorded contract and said side agreement were simultaneously prepared, and that the purported signature of the last-mentioned agreement by the Producers Transportation Company was affixed thereto by the said L. W. Andrews and W. B. Robb simultaneously with the execution of said recorded contract." It is also found that the side agreement was executed by the direction of W. L. Stewart, who was the general manager and vice-president of both corporations. It appears also that Andrews and Robb were members of the executive committee of the Transportation Company who conducted their business between the meetings of the board of directors. At the first meeting of the board of directors of the Union Oil Company after the execution of said contracts, it ratified the execution of the building contract, and at the first meeting of the Transportation Company, which occurred April 12, 1911, it ratified the side agreement. The directors of the Union Oil Company did not ratify the side agreement. Whatever might be the result of the controversy between the Union Oil Company and the Transportation Company growing out of the conduct of the officials, who were connected with both corporations, the act of the directors of the Transportation Company in ratifying the contract executed on its behalf made it the contract of that company from its inception, so that the question of the initial authority of those who executed the Transportation Company's side agreement becomes immaterial so far as the rights of the respondents are concerned. The finding of the trial court that the side agreement was the agreement of the Oil Company and the terms of payment of such side agreement were the real terms of payment by the Oil Company, is not justified by the evidence. If, at the time of the signing of the bond, the Oil Company,

instead of remaining silent, had represented the fact to be that payments were to be made in accordance with the side agreement by the Oil Company, the statement would have been untrue. The implied representation involved in presenting the original agreement to the surety, as the agreement between the parties, was in accordance with the fact. It was their agreement.

It is next claimed that if the terms of payment in the contract of the Oil Company were the agreed terms of payment, the payments made the contractor by the Transportation Company in accordance with the side agreement were, in fact, payments by the Oil Company, and that being the case, the Oil Company, by making such premature payments, altered its contract, and thus released the Surety Company. This contention, it will be observed, is based upon the theory that the side agreement was not a part of the original contract and not binding upon the Oil Company. The Transportation Company made the initial payment of ten per cent, amounting to twenty-three thousand dollars, July 7, 1910, to the contractor, and thereupon a promissory note for that amount, payable in thirty days at six per cent, was given by the contractor to the Transportation Company, and an assignment of the payments subsequently to become due from the Oil Company to the contractor under the contract was also taken as security, all as provided by the side agreement. It is true that this amount, as well as all subsequent installments called for by the side agreement, were furnished to the Transportation Company by the Oil Company, as was a total of nearly one million dollars during the five months these reservoirs were being constructed. In case of each ten per cent payment under the side agreement, the Oil Company issued a check for that amount, charging the same on its books to the Transportation Company in its account. The check was then issued by the same officers as officers of the Transportation Company, to the contractor, and his note and assignment taken as above stated. When payments became due under the contract, the amount thereof was credited back to the Transportation Company. The legal effect of the transaction was that the Union Oil Company loaned or paid to the Transportation Company the several amounts of these payments; the Transportation Company loaned the same to

the contractor, taking his note in exchange therefor, expecting reimbursement from the Union Oil Company as the work on the contract progressed, in accordance with the assignment made to it of such installment payments. There is nothing fraudulent or immoral in such a transaction. The purpose of the Transportation Company's side agreement was to facilitate the building of the reservoirs, for, without such payments during the course of the work, it is in evidence that the contractor could not have performed the work and would not have entered into the contract. A sufficient explanation for this circuitous method of financing the contractor is that the contract of the Transportation Company called for such advances and that all moneys expended by the Transportation Company were advanced to it by the Oil Company. The payments made by the Transportation Company in accordance with its separate agreement could not be taken as payment by the Oil Company. This statement, however, leaves unanswered the question as to why the side agreement was entered into in the first instance. Appellant's contention is that the interest of the Transportation Company in the building of the reservoirs was a sufficient reason for the acceptance by that corporation of the hazard involved in making the advancements required, and this may well be true. The testimony of Mr. Weber, who acted for the contractor, is to the effect that the attorney for the Oil Company insisted upon the payments as specified in the contract with the Oil Company, for the reason that such payments were necessary to comply with the law of California, referring, no doubt, to the Mechanics' Lien Law. Section 1184 of the Code of Civil Procedure, relating to contracts for improvements which might result in a mechanic's lien, provided: "No part of the contract price shall, by the terms of any such contract, be made payable, nor shall the same or any part thereof be paid in advance of the commencement of the work, but the contract price shall, by the terms of the contract, be made payable in installments at specified times after the commencement of the work, or on completion of specified portions of the work, or on the completion of the whole work; provided that at least twenty-five per cent of the whole contract price shall be made payable at least thirty-five days after the final completion of the contract." It also provided: "No payment made prior to

the time when the same is due, under the terms and conditions of the contract, shall be valid for the purpose of defeating, diminishing, or discharging any lien in favor of any person, except the contractor, but as to such liens, such payment shall be deemed as if not made, and shall be applicable to such liens, notwithstanding that the contractor to whom it was paid may thereafter abandon his contract," etc. It also provided: "In case such contracts and alterations thereof do not conform substantially to the provisions of this section the labor done and materials furnished by all persons except the contractor shall be deemed to have been done and furnished at the personal instance and request of the persons who contracted with the contractor, and they shall have a lien for the value thereof." The attorney for the Oil Company evidently took the position that payments in accordance with the side agreement, if included in the contract, would have either invalidated the contract, or so far violated the provisions of section 1184 as to allow all materialmen and laborers liens for their work regardless of the limitation of the contract price. The attorney flatly refused to make alterations of payments in the draft of the contract to conform to the wishes of the contractor, and it was for this reason, apparently, that the side agreement was proposed. It will, therefore, be observed that if the side agreement is treated as a portion of the contract between the parties, the very result which both of the contracting parties were seeking to avoid will, by construction, be accomplished, and they will be held to have entered into a contract which neither of them intended to make. The trial court found that the side agreement "was in truth and in effect a device adopted by the plaintiff and the said contractor to avoid disclosing the actual terms of payment agreed upon between plaintiff and said contractor." It is not specifically found that the purpose of the parties was to deceive the Surety Company, although it is found that the terms of payment contained in the side agreement were not disclosed to the Surety Company, and that that company had no knowledge concerning the side agreement at the time it executed its bond, and that the failure to disclose the true terms of payment "constituted and was a concealment of material facts and circumstances important for said Pacific Surety Company to know, and that the Surety Company was thereby exposed to a risk

and liability greatly in excess of that to which it would have been exposed under the terms of payment set forth in the recorded contract." [4] It is difficult to see how the surety was in any wise prejudiced by the transaction. The Oil Company having insisted on the arrangement was in no position to claim that the payments by the Transportation Company were, in fact, advance payments of the contract price made by it, and as against materialmen and laborers it was confronted with the proposition that if the loans made by the Transportation Company were, in fact, payments by the Oil Company, under the express terms of the statute such payments could not be used to diminish the amount due the contractor as against such lien claimants, and if it claimed in such litigation that the side agreement was a part of the original agreement, and that payments made in accordance therewith were made by the company, in strict accord with its contract, it would be met with the proposition that such side agreement, not having been recorded, the whole contract was void, and, therefore, the lien claimants would be entitled to foreclose liens regardless of the amount of payments or of the contract price. It was necessary for the contractor to secure money from some source during the progress of the work for the payment of material and labor used in the work, and we see no greater hazard to the surety because such payments were advanced by the Transportation Company than if they had been advanced by a bank or other money lender, secured by assignments of the contract payments to become due thereunder. [5] The surety is entitled to stand upon the strict letter of his contract and insist that the same shall not be altered. But this does not mean that he is entitled to invoke equity to read into the written contract provisions not contained therein, for the purpose of defeating his own obligation. If, as we have said, the Transportation Company, a separate entity, had been used by the officers of the Oil Company for the purpose of perpetrating a fraud upon the Surety Company, the court would relieve the Surety Company from its obligation so fraudulently procured. But there is no suggestion in the record which justifies the conclusion that this scheme was adopted for the purpose of defrauding the Surety Company.

Respondents contend that, even if we assume that the side agreement was the agreement of the Transportation Com-

pany, and that payments by the Transportation Company were not the payments of the Oil Company, nevertheless, the Oil Company made payments to the Transportation Company under the terms of the contract before such payments were actually due thereunder, and that these payments so made by the Oil Company to the Transportation Company of such installments so far altered the contract guaranteed by the Surety Company as to release the surety. From an examination of the record printed in the briefs, however, it does not appear that the defendants counted on these payments in their answers, nor did the court find that they were made. It appears that the judgment was based upon the payment of the installment of the contract price as provided in the side agreement and at the times therein specified. An examination of the typewritten transcript confirms the contention of the appellant that the decision of the trial court was not based upon the theory of the premature payments by the Oil Company to the Transportation Company.

There remains to be considered the question of the responsibility of the respondent indemnitor, Carl Leonardt. In consideration of the sum of six thousand dollars he executed to the Surety Company a contract of indemnity, by which he agreed "that in consideration of the said Pacific Surety Company becoming surety upon said bond, the said parties of the first part should and would at 'all times indemnify and keep indemnified and save harmless the said company from and against all loss, costs, damages, charges, counsel fees and expenses whatsoever, which said company shall or may for any cause, at any time sustain, incur or be put to for or by reason, or in consequence of, said company having executed said bond'; and the said parties of the first part in and by the said contract did 'further covenant and agree to pay to said company and its representatives, all damages for which said company or its representatives shall become responsible upon the said bond, before said company or its representatives, shall be compelled to pay the same; any sums so paid, however, to be applied to the payment of such damages.' " [6] Plaintiff was entitled to sue upon this contract. (*Goff* v. *Ladd,* 161 Cal. 257, [118 Pac. 792].) The same reasoning which requires us to hold that the Surety Company was not exonerated because of the execution of the side agreement or the advancements made thereunder by

the Transportation Company to the contractor, requires us to hold that Carl Leonardt, the indemnitor, is not thereby released.

The judgment is reversed.

Lennon, J., and Kerrigan, J., *pro tem.*, concurred.

Hearing in Bank denied.

All the Justices, except Olney, J., concurred.